Simpson, Judge: The Commissioner determined deficiencies in the petitioners’ Federal income taxes of $21,661.84 for 1971 and $6,237.09 for 1972. After concessions by the petitioners, the sole issue for decision is whether the petitioners are entitled to either a business loss or a bad debt deduction in 1972 with respect to Mr. Proesel’s interest in a motion picture production service partnership. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, James V. and Rosemary K. Proesel, husband and wife, resided in Lincolnwood, Ill., at the time they filed their petitions in this case. They timely filed their joint Federal income tax returns for 1971 and 1972 with the Internal Revenue Service. In 1970, El Sol Productions, Inc. (El Sol), a corporation, was formed for the purpose of producing motion pictures. Richard L. Benware and Donald W. West were the sole shareholders and officers of El Sol. During 1970, Mr. Benware and Mr. West decided to develop into a motion picture a screenplay which had been written by two El Sol employees, Eric Roth and James Collier. Such motion picture was ultimately entitled "To Catch A Pebble” (the picture). Mr. Benware and Mr. West approached Mercantile Financial Corp. (Mercantile) ,to secure financing for the picture. Mercantile was a commercial finance company which made secured business loans, including loans to finance motion pictures. Mr. Benware and Mr. West had previously borrowed money from Mercantile in connection with real estate ventures. At the request of Mr. Benware and Mr. West, Mercantile, by letter dated November 5,1970, set forth the terms and conditions upon which it would make a loan to El Sól for the production of the picture. During the period when Mr. Benware and Mr. West were negotiating with Mercantile, they were also negotiating with Burton W. Kanter, a Chicago attorney, to obtain an equity investment in the film by outside investors. Such an equity investment was needed in order to meet the budgetary requirements for the picture set by Mercantile. As a result of the negotiations with Mr. Kanter, El Sol sold, on November 3, 1970, its rights in the picture to Gavilan Finance Co. N. V. (Gavilan) for $30,000. Gavilan was a Netherlands Antilles corporation. Its management was vested in its managing director, N. V. Macor. Gavilan has never had earnings and has never declared or paid dividends; Gavilan maintained no offices other than that of its managing director. From its inception, Gavilan was not itself actively engaged in any trade or business. As of December 26,1974, Gavilan had no employees. On October 1, 1970, Benwest Production Co. (Benwest) was formed as a general partnership under the laws of the Bahamas for the purpose of engaging in the motion picture production business. The original partners of Benwest were La Motta Cinemas, a Bahamian partnership, and Castle Trust Co., Ltd., as trustee of four trusts designated as 705104, 705105, 706011, and 706012. The manager of the partnership was Gooding & Co. Gooding’s address was a post office box in Nassau, Bahamas. Subsequently, Mr. Benware and Mr. West became Benwest’s managers. By contracts dated October 20, 1970, Benwest, through El Sol, hired James Collier as director and Mr. Benware and Mr. West as producers of the picture. On December 9, 1970, Benwest entered into a production agreement with Gavilan whereby Gavilan employed Benwest to perform the production services for the making of the picture. Pursuant to such agreement, Benwest was to be paid an amount equal to the gross cost of producing the picture, not to exceed $650,000, plus $50,000. Such amount was to be paid according to the following payment schedule: (a) Monthly installments of TEN THOUSAND ($10,000.00) DOLLARS U.S. on November 1,1971, and on December 1,1971. (b) Monthly installments of TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS U.S. commencing on January 1,1972, and consecutively thereafter on the first day of each succeeding month to and including June 1,1972. (c) Monthly installments of FORTY-FIVE THOUSAND ($45,000.00) DOLLARS U.S., commencing on July 1,1972, and consecutively thereafter on the first day of each succeeding month until such time as the entire Contract Price due to Contractor [Benwest] by Owner [Gavilan] has been paid in full, provided that the final installment shall be in an amount no greater than is required to fully compensate Contractor for such remaining amounts of the Contract Price as are due it, provided, further, that Owner shall at all times have the right to prepay without penalty such amounts of the Contract Price as Owner may desire. On December 9, 1970, Benwest and Mercantile entered into a loan and security agreement, whereby Mercantile agreed to loan Benwest up to $450,000 for the production of the picture.[1] As security for such loan, Mercantile received a security interest in and to the production agreement between Benwest and Gavilan, and Benwest assigned to Mercantile all of its rights to payment under such production agreement. In addition, Mr. Benware and Mr. West severally guaranteed the completion of the film. On December 9, 1970, in consideration of Mercantile’s loaning funds to Benwest, Gavilan also entered into a security agreement with Mercantile. Pursuant to such agreement, Mercantile received a security interest in all of Gavilan’s right, title, and interest to the rights, properties, and revenues relating to the picture, including its right to any proceeds from the distribution, exhibition, or other exploitation of the picture. In addition, Gavilan guaranteed the loan to Benwest up to $300,000. To secure such guarantee, Gavilan pledged to Mercantile a certificate of deposit in the amount of $185,000 and two savings bank passbooks each in the amount of $50,000, and Gavilan also pledged a savings passbook in the amount of $100,000 as security for the $150,000 guarantee of a J. Bruce Morey. As further consideration for making the loan to Benwest, Mercantile received from Gavilan a 15-percent-net-profits interest in the picture. During 1970, Mercantile loaned $318,437 to Benwest, and Benwest expended $286,198.60 on the production of the picture. From January through April 1971, Mercantile loaned an additional $121,393 to Benwest, and such funds were expended by Benwest in the production of the picture. During March 1971, production of the picture was suspended because the picture was behind schedule and over budget. As a result, Benwest sought additional financing from Mercantile. On May 14, 1971, a supplemental loan agreement was entered into by and between Mercantile, Benwest, Gavilan, Mr. Benware, and Mr. West. Pursuant to such agreement, Mercantile agreed to loan an additional $300,000 to Benwest. One of the conditions of such loan was that Mr. Benware and Mr. West jointly and severally guarantee repayment of the $300,000 of supplemental financing, plus interest, and that Benwest procure additional equity funds in the amount of $65,000. Also, Mercantile was granted the exclusive right to license the picture for worldwide distribution, subject to Gavilan’s right to meet any offer obtained by Mercantile on a first-refusal basis, and was granted an additional 7-percent-net-profits interest in the picture. Initially, Mr. Benware and Mr. West had acquired approximately a 42-percent-net-profits interest in the picture. After the supplemental financing agreement was executed, the net-profits interests in the picture were divided as follows: Percent 22.0 Mercantile. 20.5 The law firm of which Mr. Kanter was a member.. Argosy Venture (in exchange for a $150,000 guarantee).... U2 <N¡ tH Unnamed guarantor of $150,000 O O t — ( 35.0 Producer’s share (Mr. Benware and Mr. West). 100.0 To reflect the additional cost of the picture, the production agreement between Benwest and Gavilan was amended on May 3, 1971, to provide that gross costs should not exceed $1,300,000. The payment schedule was amended as follows: (a) Monthly installments of TEN THOUSAND ($10,000.00) DOLLARS U.S. on November 1,1972, and on December 1,1972. (b) Monthly installments of TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS U.S. commencing on January 1,1973, and consecutively thereafter on the first day of each succeeding month to and including June 1,1973. (c) Monthly installments of FORTY-FIVE THOUSAND ($45,000.00) DOLLARS U.S., commencing on July 1,1973, and consecutively thereafter on the first day of each succeeding month until such time as the entire Contract Price due to Contractor [Benwest] by Owner [Gavilan] has been paid in full, provided that the final installment shall be in an amount no greater than is required to fully compensate Contractor for such remaining amounts of the Contract Price as are due it, provided, further, that Owner shall at all times have the right to prepay without penalty such amounts of the Contract Price as Owner may desire. Under both the original production agreement and such agreement as amended, Benwest had an absolute right to receive payment from Gavilan upon delivery to, and acceptance of, the picture by Gavilan. Such right to receive payment was not contingent on Gavilan’s commercial exploitation of the picture. Pursuant to the supplemental financing agreement, Mr. Benware and Mr. West executed the guarantee to Mercantile, and such guarantee was secured by certain real estate and securities. The $65,000 of additional equity funds were acquired by Benwest; $39,000 of such amount was obtained from Chico Enterprises (Chico), which was subsequently admitted as a partner in Benwest. Chico was a general partnership formed under Illinois law in July 1971 and was intended to be effective as of January 1, 1971. Its stated purpose was to provide services to motion picture companies and to invest in and become a partner of partnerships which were engaged in providing such services. Mr. Proesel was a partner in Chico, having an 8.33-percent interest in Chico’s profits and losses. He executed Chico’s partnership agreement in August 1972 and paid for his investment in Chico, $3,250, by check dated December 31, 1971. Other than such $3,250, Mr. Proesel did not make any additional capital contributions to Chico, nor was he asked to make any such additional capital contributions. In addition to his investment in Chico, Mr. Proesel also purchased, for $9,750, a 0.52-percent-net-profits interest in the picture from Davey Investments. Such purchase agreement was dated July 1, 1971, and called for payment of the $9,750 purchase price on or before December 31, 1971. Mr. Proesel paid for such interest by check dated January 6, 1972. The purchase of the net-profits interest and the investment in Chico was presented to and understood by Mr. Proesel to be a package. Prior to his investing in Chico and purchasing the net-profits interest, Mr. Proesel received a document which outlined the tax and investment consequences of such transactions. Such document projected tax deductions in 1971 of over $700,000 in exchange for an investment of $260,000 and, in addition, offered the opportunity for additional profit if the picture was successful. At the time such document was prepared, the picture was three-fourths completed. Benwest’s partnership agreement was amended, effective as of January 1, 1971, to reflect the admittance of Chico as a partner and the admittance of three other general partnerships (Featherweight Associates, Jetta Group (a'partnership of which Mr. Benware and Mr. West were 50-percent partners), and Cinema Investment Associates) which had previously purchased La Motta Cinemas’ interest in Benwest. Such amendment granted Chico a 45-percent interest in Benwest’s profits and losses. Such amendment also provided, in part, that: 6. Partnership Accounts. Notwithstanding anything to the contrary contained herein, each partner shall be responsible for the following percentage of the liabilities of the Partnership: * * * * * * * Chico - 40.5 percent * * * * * * * 7. Prior Agreement. Except as modified by this Amendment, the Partnership Agreement shall continue to regulate the affairs of the Partnership and to define the rights and obligations of the partners. Whenever necessary the Partnership Agreement shall be interpreted so that the rights and obligations thereunder shall inure to the benefit of and be binding upon the parties to this Amendment as if all of them had been specifically named therein. Although Mercantile had agreed to loan Benwest an additional $300,000, it, in fact, advanced to Benwest $639,375.51 from May 1971 through December 1971. From 1972 through January 1980, Mercantile advanced an additional $45,487.11 to Benwest. Thus, from December 1970 through January 1980, Mercantile advanced to Benwest a total of $1,124,692.62. The picture was substantially completed in the fall of 1971. During 1971 and 1972, extensive efforts were made to find a distributor for the picture; all of the major studios and major independent distributors were contacted. However, none of such efforts resulted in the obtaining of a distribution agreement. In mid-1972, after the initial efforts in finding a distributor proved unsuccessful, Mercantile hired an outside film expert to review the film. In the opinion of such expert, the film needed reediting, which was subsequently accomplished. From 1973 into 1977, efforts continued to be made, although on a diminished basis, to find a distributor or otherwise commercially to exploit the picture. Such efforts included negotiations in mid-1973 with Harold Rand & Co., Inc., and Allied Artists ^ Pictures Corp. and Mercantile’s negotiations with Craig Production Co. in 1975 and with Crown International Pictures, Inc., in 1977. A memorandum from Mr. Benware and Mr. West dated July 18, 1974, concluded that although the major distributor route had been exhausted, there remained the possibility of dealing with exhibitors, a sale to television, foreign distribution, and a sale of the picture’s music. In April 1975, the Code & Rating Administration of the Motion Picture Association issued a PG rating for the picture. Yet, all of such efforts were unsuccessful in finding a distributor or otherwise selling the picture. By letter dated December 2, 1974, Mercantile notified Gavilan that, since Benwest had defaulted on its loan and Gavilan was in default on its guarantee, Mercantile would collect the certificate of deposit which Gavilan had pledged as security for its guarantee. Such certificate of deposit had been rolled over since the time it was originally pledged. On December 13, 1974, Mercantile collected the proceeds of such certificate of deposit, $225,000 plus interest at 11 percent, from May 24 to December 13,1974, and applied such proceeds to the interest due on its loan to Benwest. On April 5, 1977, Mercantile filed suit in the U.S. District Court for the Northern District of Illinois against Benwest, Gavilan, Mr. Benware, Mr. West, and the other guarantors to foreclose on Mercantile’s security interests, including the public sale of the picture. Such complaint stated that Benwest owed Mercantile $809,095.44 plus interest. In July 1977, the parties to such suit agreed to the public sale of the picture and the application of the sale proceeds to the indebtedness owed to Mercantile. Mercantile bid in the picture for a price of $60,000. The property pledged by Mr. Benware and Mr. West as security for their guarantee was sold by Mercantile, and the proceeds were applied to outstanding interest on the loan. Pursuant to such guarantee, $350,000 was applied to interest due on the loan. As of February 29, 1980, Mercantile had received payments, excluding the "bid in” price of the picture, of $739,289.99, all of which was applied to the outstanding interest on the loan. In 1980, Mercantile filed suit against Benwest and its partners, including Mr. Proesel, in Cook County (Illinois) Circuit Court. In such suit, Mercantile sought to collect from such partners the amount still owed it in connection with its loans to Benwest. Both Benwest and Chico used the cash method of accounting. On its Federal partnership return for 1970, Benwest reported no income and claimed deductions of $286,198.60 for the costs of producing the picture. On its return for 1971, Benwest reported income of $126,105.81, $114,858.62 of which represented incentive payments from the Israeli Government, and claimed deductions of $1,084,141.85 for the costs of producing the picture, resulting in a claimed loss of $958,036.04. On its return for 1971, Chico claimed its pro rata share (45 percent) of such loss, $431,116.20. On their joint Federal income tax return for 1971, the petitioners claimed as a deduction Mr. Proesel’s pro rata share (8.33 percent) of Chico’s reported loss, $35,911.98. On its Federal partnership return for 1972, Benwest reported no income and claimed deductions of $71,427.49 for the costs of producing the picture. On its return for 1972, Chico claimed its pro rata share of such loss, $32,142.38. On their joint Federal income tax return for 1972, the petitioners claimed as a deduction Mr. Proesel’s pro rata share of Chico’s reported loss, $2,677.46. In his notice of deficiency for 1971, the Commissioner determined that Benwest’s income should have been increased by $1,037,102.19, that, as a result of such adjustment, Chico’s income should have been increased by $446,695.97, and that, accordingly, the petitioners’ income should have been increased by $38,875.77. The Commissioner’s reasons for such adjustments were that Benwest had not, in substance, incurred any expenses or liabilities for which it was not paid or reimbursed, that the loans to Benwest were not bona fide, but rather represented income to it, and that $1,037,102.19 of the expenses incurred and claimed as deductions in connection with the production of the picture should have been capitalized.[2] At trial and on brief, the petitioners conceded that the costs incurred in producing the picture in 1971 should have been capitalized; therefore, they do not dispute the deficiency for that year. In his notice of deficiency for 1972, the Commissioner determined that Benwest’s income should have been increased by $312,897.81, that as a result of such adjustment, Chico’s income should have been increased by $140,804.03, and that, accordingly, the petitioners’ income should have been increased by $11,728.98. The Commissioner’s reasons for such adjustments were that Benwest had not in substance incurred any expenses or liabilities for which it was not paid or reimbursed, that the loans to Benwest were not bona fide, but rather represented income to it, and that $56,821.31 of the expenses incurred and claimed as deductions in connection with the production of the picture should have been capitalized.[3] Alternatively, the Commissioner determined that if the costs of producing the picture ($1,037,102.19 incurred in 1971 and $56,821.31 in 1972) were allowable in 1972, Benwest had unreported "Contract Income” in the amount of $1,350,000, resulting in net income for 1972 of $256,076.50. OPINION The petitioners’ concession that the expenses which Benwest incurred in producing the picture should be capitalized is dispositive of the issues for 1971. However, the petitioners contend that the picture became worthless in 1972 and that, therefore, Benwest’s right to receive payments from Gavilan pursuant to the production agreement also became worthless in such year. Hence, they conclude that since Chico’s only asset was its investment in Benwest, Mr. Proesel’s interest in Chico likewise became worthless in 1972. Therefore, they argue that they are entitled to either a business loss deduction under section 165 of the Internal Revenue Code of 1954 [4] or a bad debt deduction under section 166 in 1972 for Mr. Proesel’s pro rata share, 3.7485 percent,[5] of the capitalized cost of producing the picture. The Commissioner contends that the petitioners are not entitled to such a deduction in 1972, since they have not shown that the picture, or the right of Benwest to receive payment therefor, became worthless in that year; he asserts that, at the earliest, the picture became worthless in 1977 when Mercantile foreclosed on its security interest in the picture. He also disputes the petitioners’ right to claim a loss based on the indebtedness incurred by Benwest. In the generic sense, a loss cannot be both a business loss and a bad debt. Lewellyn v. Electric Reduction Co., 275 U.S. 243, 246 (1927); Lidgerwood Manufacturing Co. v. Commissioner, 22 T.C. 1152, 1156 (1954), affd. 229 F.2d 241 (2d Cir. 1956), cert. denied 351 U.S. 951 (1956). Hence, our initial inquiry must be directed to determining whether section 165 or 166 governs the deductibility of any loss sustained by the petitioners. Section 166 provides that a deduction shall be allowed with respect to any debt owed to a taxpayer which becomes worthless during the taxable year. See sec. 1.166-l(a), Income Tax Regs. Only worthless claims which arise as a result of a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money are allowable as deductions under section 166. Sec. 1.166-l(c), Income Tax Regs. Generally, a claim arising out of a breach of contract, prior to being reduced to judgment, does not create such a debtor-creditor relationship because the injured party has only an unliquidated claim for damages. Lewellyn v. Electric Reduction Co., supra; DeLorenzo v. United States, 308 F. Supp. 52, 53 (D. Ore. 1969); Schaff v. Commissioner, 46 B.T.A. 640, 645-646 (1942); see also Carlisle v. Commissioner, 37 T.C. 424 (1961); Hanes v. Commissioner, 2 T.C. 213 (1943). Such a claim is deductible, if at all, under section 165. Under the terms of the production agreement, Benwest had the right to receive payments from Gavilan upon delivery of the picture to, and its acceptance by, Gavilan; such payments were not contingent upon Gavilan’s receipt of funds from the distribution or commercial exploitation of the picture. During 1972, Benwest did not receive any of the payments which Gavilan was apparently obligated to make under the terms of the production agreement. Thus, as of the end of 1972, Gavilan was apparently in default on its contractual obligations. However, the record is devoid of any evidence that during such period, Benwest reduced its claim against Gavilan to judgment or even attempted to collect the payments due to it. Accordingly, a debtor-creditor relationship did not exist within the meaning of section 166, and therefore, the only section under which the petitioners may be able to claim a loss is section 165. The next question we address is the amount which may be allowable with respect to the worthlessness of the right of Benwest to receive payment for the production of the picture. Section 165(b) provides that the basis for determining the amount of the deduction for any loss shall be the taxpayer’s adjusted basis in the property with respect to which the loss was sustained. See sec. 1.165-l(c), Income Tax Regs. A partner’s adjusted basis in his interest in a partnership, to the extent such interest was acquired by contributions, is generally the amount of money and the adjusted basis of property contributed by the partner to the partnership, increased by his share of taxable income and certain deductions and decreased (but not below zero) by losses, distributions, and nondeductible expenditures.[6] Secs. 705 and 722. In addition, section 752(a) provides that any increase in a partner’s share of the liabilities of the partnership shall be considered as a contribution of money by such partner to the partnership. See sec. 1.752-l(a), Income Tax Regs. In the case of a general partnership, such as Benwest and Chico, a partner’s share of partnership liabilities is determined in accordance with such partner’s ratio for sharing losses under the partnership agreement. Sec. 1.752-1(e), Income Tax Regs. The petitioners contend that Mr. Proesel’s basis in Chico includes both the amount of his cash contribution, $3,250, and his pro rata share, 3.7485 percent, of Benwest’s liabilities. The Commissioner, on the other hand, argues that Mr. Proesel is not entitled to include any of such liabilities in his basis. Alternatively, the Commissioner argues that if Mr. Proesel can include such liabilities in his basis, the amount which can be so included is limited to the amount of liabilities incurred by Benwest after the date of Chico’s admittance as a partner in Benwest, July 1,1971.[7] The Commissioner bases his arguments on two theories. First, he argues that since Benwest’s partners (other than Mr. Benware and Mr. West, who made payments pursuant to their guarantees) have completely avoided repayment of Benwest’s indebtedness, they should not be allowed to include such liabilities in their bases. It is the Commissioner’s contention that Benwest, through Mr. Ranter, misled Mercantile into believing that all of Benwest’s partners were judgment-proof and that such conduct evidences an implied understanding among Benwest’s partners that they would not be personally liable for repayment of Benwest’s liabilities beyond the amount of their cash contributions. Therefore, the Commissioner would have us hold that the "technical liability” of the partners does not come within the meaning of section 752, and that only if a partner was found to be liable and actually made payments on the loan should he be allowed to include his pro rata share of Benwest’s liabilities in his basis. The Commissioner cites no authority for such proposition, nor has this Court been able to find any authority for our holding that the mere avoidance of repayment, without more, precludes a partner from including a liability in his basis. The Commissioner, in effect, concedes that Benwest borrowed funds from Mercantile and that such loan created a bona fide indebtedness. Compare Estate of Helliwell v. Commissioner, 77 T.C. 964 (1981). The fact that Mr. Benware and Mr. West, in addition to their liability as partners of Benwest, guaranteed a portion of such loan does not alter the fact that Benwest was the primary obligor on such loan and, accordingly, does not affect the right of the partners of Benwest to include their pro rata share of such liability in their bases. See Putnam v. Commissioner, 352 U.S. 82 (1956); Rushing v. Commissioner, 58 T.C. 996 (1972); Eskimo Pie Corp. v. Commissioner, 4 T.C. 669 (1945), affd. per curiam 153 F.2d 301 (3d Cir. 1946). Furthermore, the fact that property is acquired by a loan on which there is personal liability does not preclude the recognition of loss with respect to such property even if the loan has not been repaid. Crain v. Commissioner, 75 F.2d 962, 964 (8th Cir. 1935), affg. Wilson v. Commissioner, a Memorandum Opinion of this Court dated Jan. 9, 1934; Kennan v. Commissioner, 20 B.T.A. 498, 499 (1930); Weis v. Commissioner, 13 B.T.A. 1284, 1288-1289 (1928). We also take note that in 1980, Mercantile filed suit against Benwest and its partners, including Mr. Proesel, in Cook County (Illinois) Circuit Court. Hence, it is possible that Mr. Proesel may yet be called upon to pay his share of Benwest’s liability to Mercantile. The Commissioner’s second, and alternative, argument is that under section 17 of the Uniform Partnership Act, as adopted in Illinois (see Ill. Ann. Stat. ch. 106%, sec. 17 (Smith-Hurd 1952)), Mr. Proesel can only include in his adjusted basis such liabilities as were incurred by Benwest subsequent to Chico’s admittance as a partner.[8] Such section provides that a person admitted as a partner in an existing partnership is not liable for preexisting partnership liabilities, except to the extent of his interest in partnership property. However, such section is not applicable where there is either an express or implied assumption of preexisting indebtedness by an incoming partner. Magrini v. Jackson, 17 Ill. App. 2d 346, 150 N.E.2d 387, 392 (1958). Neither Mr. Proesel, nor any other Chico partner, had, to the date of trial, been required to pay or volunteered to pay any of Benwest’s liabilities. The Commissioner contends that such failure to pay is evidence that such partners did not impliedly assume any of Benwest’s preexisting obligations. However, such an assumption can be expressed as well as implied. In our view, the language of sections 6 and 7 of the amended partnership agreement of Benwest (as set forth in our findings of fact) clearly reflects the intention of the incoming partners, including Chico, to assume liability for the preexisting indebtedness of Benwest. Accordingly, Mr. Proesel is entitled to include in his basis his pro rata share of Benwest’s liabilities, including those incurred prior to Chico’s admittance, pursuant to section 752(a). The final question to be considered is whether the right of Benwest to receive payment from Gavilan became worthless in 1972. Generally, section 165 allows a deduction for a loss sustained during the taxable year and not compensated for by insurance or otherwise, To be allowable, a loss must be evidenced by closed and completed transactions which are fixed by identifiable events and actually sustained during the taxable year. Sec. 1.165-l(b) and (d), Income Tax Regs. Such events include a sale, an abandonment, or other acts or events which reflect the fact that the property is worthless. Secs. 1.165-l(d), 1.165-2(a), Income Tax Regs.; Gordon v. Commissioner, 46 B.T.A. 1201, 1210 (1942), affd. sub nom. Helvering v. Gordon, 134 F.2d 685 (4th Cir. 1943). Although a taxpayer need not be an incorrigible optimist in his determination of when property became worthless (see United States v. S. S. White Dental Manufacturing Co., 274 U.S. 398, 403 (1927)), a mere decline, diminution, or shrinkage in value is not sufficient to establish a loss (see sec. 1.165-l(b), Income Tax Regs.; New York Life Ins. Co. v. Edwards, 271 U.S. 109 (1926); Reporter Publishing Co. v. Commissioner, 18 T.C. 86 (1952), affd. 201 F.2d 743 (10th Cir. 1953), cert. denied 345 U.S. 993 (1953); White Star Line v. Commissioner, 20 B.T.A. 111 (1930)). The question of worthlessness is peculiarly one of fact. Boehm v. Commissioner, 326 U.S. 287, 293 (1945). The petitioners bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111 (1933). The petitioners contend that by the end of 1972, there was no meaningful chance of having the picture distributed, and that although some modest efforts were made to exploit commercially the picture in subsequent years, the picture was economically worthless in 1972. In support of such contention, they point to the testimony of Robert H. Greenberg. In 1971, Mr. Greenberg was employed by Mercantile as the supervisor of commercial loans and was directly involved with the loans to Benwest. He is currently involved in the motion picture business. Mr. Greenberg testified that 20 percent of motion pictures are never distributed. He also testified that the average time for entering into a distribution agreement after completion of a motion picture is 6 to 9 months and that, after a motion picture is offered to the major studios and independent distributors for distribution and is rejected by them, the possibility of having the motion picture exhibited in any meaningful way, including a sale to television, is extremely remote. However, the testimony of Mr. Greenberg consists merely of statements of generalities in the movie industry which are contradicted by the facts of this case. We agree with the petitioners that by the end of 1972, it was unlikely that a distribution contract with a major studio or a major independent distributor would be obtained. However, the possibility of commercially exploiting the picture remained viable. In fact, negotiations for the distribution and sale of the picture continued into 1977. Also, in 1974, Mr. Benware and Mr. West were of the opinion that although the major distributor route had been exhausted, there remained the possibility of dealing with exhibitors, a sale to television, a sale of foreign distribution rights, and a sale of the picture’s music. Furthermore, in July 1977, the parties to Mercantile’s suit agreed to the public sale of the picture and the application of the proceeds to Benwest’s indebtedness. At such sale, Mercantile bid in the picture for $60,000, and that amount was applied to the interest owing on the loan. The facts that Mercantile first attempted to find a distributor for the picture and that, only when a distributor could not be found, paid a substantial sum for the rights to the picture indicate that the picture was hot worthless even in 1977. Accordingly, we find and hold that in 1972, the picture had suffered merely a diminution in value and that, as to Benwest, the picture did not become worthless until foreclosed on by Mercantile in 1977. See Finney v. Commissioner, 253 F.2d 639 (9th Cir. 1958), affg. on this issue a Memorandum Opinion of this Court. What is more, even if the petitioners had shown that the picture was worthless in 1972, such proof would not entitle them to a loss deduction in that year. Under the terms of the production agreement with Gavilan, Benwest had a right to receive the payments for the production of the picture on its delivery to Gavilan and Gavilan’s acceptance of it; such rights were not contingent on Gavilan’s exploitation of the picture. Although at the end of 1972, Gavilan had apparently breached its contractual obligation, the mere breach of a contract is not enough to establish a loss until the litigation with respect to the contract is settled or it is shown that such litigation would be fruitless. See Lucas v. American Code Co., 280 U.S. 445 (1930); P. C. Tomson & Co. v. Commissioner, 82 F.2d 398 (3d Cir. 1935), affg. on this issue a Memorandum Opinion of this Court; H. D. Lee Mercantile Co. v. Commissioner, 79 F.2d 391 (10th Cir. 1935), affg. a Memorandum Opinion of this Court; Uhrbrand & Lervick Construction Co. v. Commissioner, 21 B.T.A. 230 (1930); Akron Auto Garage Co. v. Commissioner, 1 B.T.A. 1066 (1925); see also sec. 1.166-2(b), Income Tax Regs. Thus, unless Gavilan’s sole asset consisted of its rights to the picture, the worthlessness of the picture would not in and of itself show that a suit against Gavilan would have been fruitless. From the record, we know little concerning Gavilan’s business activities or its finances. The sole direct evidence as to Gavilan’s finances is its answer to an interrogatory filed by Mercantile in connection with a suit by Gavilan against Mercantile for the alleged conversion of assets pledged by Gavilan in connection with the financing of the picture. In such answer, Gavilan states that, at the time such suit was commenced (1974), it had no real or personal property other than its rights in the picture and a chose in action (the subject matter of the suit) against Mercantile. Such evidence is irrelevant with respect to Gavilan’s financial condition in 1972. Also, even if such evidence was relevant, such uncorroborated evidence is not sufficient to carry the petitioners’ burden of proof. If, as the petitioners contend, Gavilan operated as more than a mere shell, it may have had some assets. Except for the 22-percent-net-profits interest in the picture granted to Mercantile, Gavilan, unless it gave away such interests, should have received valuable consideration for the other net-profits interests which it granted. We take note of the fact that Mr. Proesel purchased, although such purchase was from a third party, a 0.52-percent-net-profits interest in the picture for $9,750. Hence, there is simply insufficient evidence with respect to Gavilan for us to find that Benwest’s right to receive payments under the production agreement has ever become worthless. Decisions will be entered for the respondent. The picture was to be produced in Israel, and as a result, certain rebates were expected from the government of Israel. The total loan was not to exceed $300,000 plus the amount of rebates from the government of Israel assigned and payable to Mercantile, or $450,000, whichever was less. Previously, Benwest had directed the Israeli Government to pay to Mercantile all rebates due Benwest. For 1971, the Commissioner allowed Benwest to deduct currently expenses in the amount of $47,039.66. For 1972, the Commissioner allowed Benwest to deduct currently expenses in the amount of $14,606.18. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated. Chico had a 45-percent interest in Benwest’s profits and losses, and Mr. Proesel had an 8.33-percent interest in Chico’s profits and losses: 45% X 8.33% = 3.7485%. The petitioners have not claimed a loss with respect to Mr. Proesel’s net-profits interest in the picture. The basis of an interest in a partnership acquired other than by contribution is governed by sec. 742. Of the $1,124,692.62 advanced by Mercantile to Benwest, $938,831.36 was advanced prior to July 1, 1971, and $185,861.26 was advanced after such date. Mr. Proesel’s share of Benwest’s losses was 3.7485 percent. Therefore, the Commissioner contends that Mr. Proesel’s share of such liabilities is limited to $6,967 ($185,861.26 x 3.7485%). Sec. 17. Liability of person admitted to partnership for past obligations A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when such obligations were incurred, except that this liability shall be satisfied only out of partnership property. Chico was a general partnership formed under Illinois law.