THE BROWN CORPORATION OF IONIA, INC., a Michigan corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brown Corp. of Ionia, Inc. v. Commissioner
Docket No. 2906-79
United States Tax Court
T.C. Memo 1982-683; 1982 Tax Ct. Memo LEXIS 48; 45 T.C.M. (CCH) 200; T.C.M. (RIA) 82683; November 29, 1982. *48 E. James Gamble and Thomas S. Vaughn, for the petitioner. Chauncey W. Tuttle, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the income tax of petitioner, The Brown Corporation of Ionia, Inc., for the taxable years ended August 31, 1971, August 31, 1972, August 31, 1973, and August 31, 1974, in the amounts of $76,042, $65,472.30, $230,347.67, and $132,956.60, respectively. The issues for decision are (1) whether petitioner, The Brown Corporation of Ionia, Inc., is entitled to a bad debt deduction for its fiscal year 1974 under section 166[1] or, in the alternative, a net operating loss deduction in this fiscal year because of a net operating loss carryback from its fiscal years 1975, 1976, or 1977 arising from a bad debt deduction, and (2) whether, in the alternative, the corporation is entitled to a theft loss deduction for any of its fiscal years 1974, 1975, 1976 or 1977 under section 165(a). FINDINGS OF FACT Some of the facts have been stipulated and are *49 found accordingly. Petitioner, The Brown Corporation of Ionia, Inc., is a corporation duly incorporated under the laws of the State of Michigan. At the time of the filing of its petition herein, petitioner maintained its principal office in Ionia, Michigan. Petitioner filed its Federal income tax returns for the taxable years ended August 31, 1971, August 31, 1972, August 31, 1973, and August 31, 1974, with the Internal Revenue Service Center, Cincinnati, Ohio. Brown Corporation of Ionia, Inc. (Brown Corporation), is a manufacturing company engaged in metal stamping and the assembly of parts for the automotive industry. Brown Corporation was formed in Michigan on September 2, 1955, as the successor to a partnership engaged in the same business. Prior to September 27, 1973, all of Brown Corporation's 21,800 outstanding shares were held by the following persons in the amounts indicated: Stockholder
Shares
Edward H. Brown
10,300
Orson E. Coe
8,100
Richard F. LeValley
600
Charles T. Brown
300
Joseph E. Brown
300
Orson E. Coe Pontiac, Inc.
2,200
21,800
In late 1972 or early 1973, Orson E. Coe and Edward H. Brown (Mr. Brown), the two major shareholders of Brown Corporation, decided that they wished *50 to find a buyer for the corporation. Mr. Brown and Mr. Coe were not getting along, but neither wished to sell to the other. Mr. Coe and Mr. Brown agreed that they should sell the corporation and subsequently they made it generally known that the corporation was for sale. Mr. Brown and Mr. Coe were at this time being advised by their attorney, Rex P. O'Connor. Mr. O'Connor had previously represented both principal shareholders for many years. Additionally, at this time he was the legal counsel and a director of Brown Corporation. Mr. Brown and Mr. Coe received many inquiries concerning a possible sale of Brown Corporation. Mr. Brown, Mr. Coe and their attorney, Mr. O'Connor, considered only four of these inquiries to be serious. Two of the prospective purchasers making serious inquiries were Terr, Wickwire and Company (Terr, Wickwire), another Michigan corporation engaged in manufacturing, and John B. Lampe on behalf of Spaco Manufacturing Company (Spaco Manufacturing). Mr. Lampe contacted Mr. Brown and Mr. Coe in the latter part of May 1973 and made an offer to have Spaco Manufacturing, a corporation whose stock he wholly owned, purchase all of the stock of Brown Corporation *51 for $2 million.At about this time, Terr, Wickwire made an offer to acquire Brown Corporation for a price of $1.6 million. Mr. O'Connor and his two clients had a conference at which they evaluated the merits of the two offers. All three knew Terr, Wickwire to be an established, reputable corporation, and did not doubt that Terr, Wickwire was financially capable of acquiring Brown Corporation. In contrast, none of the three knew much about Mr. Lampe or Mr. Lampe's corporation, Spaco Manufacturing, other than that Mr. Lampe had represented himself to them to be a very wealthy individual. Mr. Brown and Mr. Coe decided to accept the offer to sell to Spaco Manufacturing if an investigation confirmed Mr. Lampe's financial status and adequate security measures could be negotiated and provided as part of the sales agreement. Mr. O'Connor subsequently contacted Mr. Lampe, who was also an attorney. Mr. Lampe furnished the Brown Corporation shareholders with both a personal resume and a financial statement. The financial statement listed all of Mr. Lampe's assets and liabilities as of May 15, 1973, and disclosed that he had as of that date a net worth of $3,688,872. The major asset shown *52 on the financial statement was a $3,245,057 beneficial interest in a trust established with the First National Bank of Lake Forest, Illinois. The liabilities listed on the financial statement included two notes, both payable to the First National Bank of Lake Forest, Illinois, in the respective amounts of $625,000 and $11,000. Mr. Lampe told Mr. O'Connor that the First National Bank of Lake Forest was his credit reference and could be contacted to verify his financial condition. Since Mr. O'Connor was both a director and an attorney for the local bank in Ionia, he had two officers of the local bank contract the First National Bank of Lake Forest, Illinois, to inquire as to the financial condition of Mr. Lampe and his credit rating. These officers of the local Ionia bank reported to Mr. O'Connor that they had learned that Mr. Lampe was indeed a wealthy man, that he had established a trust, and that the First National Bank of Lake Forest was the custodian of the assets of the trust. Mr. O'Connor requested and received from Mr. Lampe a copy of the trust agreement.The trust agreement showed that the Lake Forest bank had agreed to become the custodian of assets consisting of sizable *53 holdings of shares in American Airlines, Kennecott Copper, and Rheingold. Mr. Lampe also furnished Mr. O'Connor with information on his corporation, Spaco Manufacturing, and on its subsidiary, Spaco, Inc. Spaco Manufacturing, a Delaware corporation, was a holding company whose main asset was its ownership of 82.4 percent of the shares of Spaco, Inc., an Alabama corporation. Both corporations were situated in Huntsville, Alabama. Spaco, Inc., the subsidiary, was engaged in the manufacture of metal parts and assemblies for the aerospace industry. Mr. O'Connor, after evaluating the information furnished to him on these two corporations by Mr. Lampe, concluded, however, that Spaco Manufacturing did not have sufficient resources to handle the purchase of Brown Corporation. Mr. O'Connor, in his discussions with Mr. Lampe, informed him of this conclusion. Mr. Lampe assured Mr. O'Connor that he was a man of considerable wealth. Mr. Lampe stated, however, that he did not wish to dispose of the stock in his trust since at the time stock values were depressed and he preferred to hold on to the stock until prices improved. Mr. Lampe stated that, when prices improved, he would sell off *54 some of the shares in the trust and place sufficient funds into Spaco Manufacturing to handle the proposed transaction. Mr. O'Connor advised his two clients that, although Spaco Manufacturing could not afford to buy Brown Corporation, Mr. Lampe possessed more than enough resources with which to buy the corporation. Spaco Manufacturing, acting through Mr. Lampe as its president, had previously applied for a loan in the amount of $1.6 million from Associates Capital Corporation of Delaware, Inc. (Associates), in order to finance the proposed purchase of the shares of Brown Corporation. After a series of communications between Mr. Lampe and Associates, Associates by letter dated August 15, 1973, informed Mr. Lampe, in his capacity as president of Spaco, Inc., of the proposed terms under which it would grant a line of credit to Spaco Manufacturing in the amount of $1.6 million.
Spaco Manufacturing, through Mr. Lampe, also applied for a loan in the amount of $330,000 from MorAmerica Capital Corporation (MorAmerica) in order to finance its acquisition of Brown Corporation. Mr. O'Connor contacted representatives of both lending companies, Associates and MorAmerica, and learned from them *55 that both companies had not only investigated Mr. Lampe in much the same fashion as Mr. O'Connor had, but had also gone further in investigating the financial resources of both Spaco Manufacturing and Spaco, Inc. Mr. Brown, Mr. O'Connor's client, visited Huntsville, Alabama, in order to examine Spaco, Inc. Mr. Brown reported to Mr. O'Connor that, as a result of his trip, he was of the opinion that Spaco, Inc., was a going manufacturing concern. On September 27, 1973, all of Brown Corporations's shareholders entered into an agreement with Spaco Manufacturing under which they agreed to sell all of their stock to Spaco Manufacturing for $2 million. Spaco Manufacturing agreed to pay each shareholder $91.743119 per share as follows: Stockholder
Shares
Amount
Edward H. Brown
10,300
$ 944,954
Orson E. Coe
8,100
743,119
Richard F. LeValley
600
55,046
Charles T. Brown
300
27,523
Joseph E. Brown
300
27,523
Orson E. Coe Pontiac, Inc.
2,200
201,835
Totals
21,800
$2,000,000
The parties contemplated that closing under the agreement would take place on October 1, 1973. Interest was to be paid on the various purchase amounts at the rate of 8 percent per annum, computed as of June 1, 1973. The following table summarizes *56 the terms of payment under the agreement: Edward H.
Orson E.
Richard F.
Charles T.
Brown
Coe
LeValley
Brown
I. Purchase Amounts
$944,954
$743,119
$55,046
$27,523
A. Payments at closing
on 10/1/73
257,500 ab
55,665 ab
16,500 ab
8,250 a bb
Joseph E.
Orson E. Coe
Brown
Pontiac, Inc.
Totals
I. Purchase Amounts
$27,523
$201,835
$2,000,000
A. Payments at closing
on 10/1/73
8,250 ab
201,835 a
548,000
Edward H.
Orson E.
Richard F.
Charles T.
Brown
Coe
LeValley
Brown
B. Payments on 1/2/74
a $10,000
b *57 $359,908
c $38,546
c $19,273
Joseph E.
Orson E. Coe
Brown
Pontiac, Inc.
Totals
B. Payments on 1/2/74
c $19,273
$447,000
Edward H.
Orson E.
Richard F.
Charles T.
Brown
Coe
LeValley
Brown
C. Payment on 9/1/74
$67,745a
Joseph E.
Orson E. Coe
Brown
Pontiac, Inc.
Totals
C. Payment on 9/1/74
$67,745
Edward H.
Orson E.
Richard F.
Charles T.
Brown
Coe
LeValley
Brown
D. Payment on 1/2/75
$327,546
E.Remaining 9
$607,086
installments to be
paid on Sept. 1 of each
year during period from
9/1/75 through 9/1/83.
Joseph E.
Orson E. Coe
Brown
Pontiac, Inc.
Totals
D. Payment on 1/2/75
$327,546
E. Remaining 9
607,086
installments to be
paid on Sept. 1 of each
year during period from
9/1/75 through 9/1/83.
Under the agreement, all of the shareholders, except for Mr. Coe and Mr. Brown, were to be paid in full by January 2, 1974, within 3 months after the October 1, 1973, closing date. Mr. Coe, however, would be paid *58 in full by January 2, 1975, within 1 year and 3 months after closing.Since $677,454 of the amount to be paid to Mr. Brown was to be paid to him over a 10-year period beginning September 1, 1974, the agreement provided that the entire indebtedness owed to him was to be secured by a first mortgage on all of the real estate owned by Brown Corporation and by a security agreement on all of Brown Corporation's machinery and equipment. The security agreement on the machinery and equipment, however, was to be subject and junior to any security agreement executed by Spaco Manufacturing in favor of a lending institution to the extent that such amount did not exceed $300,000. The indebtedness to all of the other shareholders, except for Mr. Brown and Orson E. Coe Pontiac, Inc., was to be secured either by (1) funds deposited in escrow, (2) irrevocable letters of credit, or (3) such other collateral as was acceptable to Mr. Coe or to Mr. Coe's bank. The agreement also expressly provided that the total indebtedness to all shareholders was to be secured by a personal guarantee to be executed by Mr. Lampe. This guarantee was to be in the form attached to the agreement as an exhibit. A further *59 condition of the agreement was that Spaco Manufacturing would enter into a management agreement with Mr. Brown. Prior to closing, Associates decided that it was not willing to make available at closing and on January 2, 1974, the full amount it had previously indicated it would lend to finance the transaction. In order to proceed with closing, Mr. Coe and Mr. Brown both agreed to take back unsecured notes of Spaco Manufacturing for a further portion of the purchase price to be paid to them, provided that Mr. Lampe personally guaranteed both such notes. Mr. Coe agreed to take a further $50,000 note of Spaco Manufacturing at closing, reducing the $55,665 that was previously agreed would be paid to him in cash. Mr. Brown agreed to loan back the interest to be paid to him at closing to Spaco Manufacturing for that corporation's note. The closing of the agreement for the purchase of the stock occurred on December 18, 1973. All of Brown Corporation's shareholders transferred their shares to Spaco Manufacturing. Spaco Manufacturing, as sole shareholder of Brown Corporation, held a special meeting of the shareholders. At that meeting on December 18, 1973, the resignations of the directors *60 of Brown Corporation were accepted and Mr. Lampe, Mr. Brown, Mr. O'Connor, and a Mr. John W. Damisch were elected to serve as the new directors of Brown Corporation. Mr. Lampe induced Brown Corporation's officers and directors to cause that corporation to join in the borrowing of funds required to satisfy Spaco Manufacturing's obligations and to quarantee and to secure the payment of Spaco Manufacturing's obligations by representations he made prior to and at the closing that he intended to liquidate his personal securities when the market conditions were appropriate, and that he would then lend sufficient money to Spaco Manufacturing to pay the indebtedness incurred to discharge Spaco Manufacturing's obligations under the stock purchase agreement. On the December 18, 1973, closing date, several agreements were entered into by Spaco Manufacturing, Brown Corporation, Mr. Lampe, and Associates in connection with Associate's loan. A basic loan agreement for the full amount to be loaned by Associates was entered into by Spaco Manufacturing and Brown Corporation as principal debtors. As part of the overall loan transaction, Brown Corporation entered into an accounts receivable financing *61 agreement with Associates for a loan of $725,000 secured by the accounts receivable of Brown Corporation. Brown Corporation, as a further part of the overall loan transaction, also entered into an inventory financing agreement with Associates for a loan of $340,000 secured by all of Brown Corporation's inventory as well as by all of Brown Corporation's accounts receivable, contract rights, and general intangibles. The three agreements which Brown Corporation joined in were signed for it by Mr. Lampe in his capacity as its chairman of the board. Mr. Lampe, individually, executed a continuing personal guarantee of the loan being made to Brown Corporation and Spaco Manufacturing by Associates. Additionally, Mr. Lampe, individually, also executed a pledge agreement under which he pledged all of the stock of Spaco Manufacturing as security for the loan being made to Spaco Manufacturing and Brown Corporation. Associates disbursed $1,065,000 to Spaco Manufacturing and Brown Corporation on December 18, 1973, and $75,000 on January 2, 1974. Of these amounts, $711,109.58 was used to discharge Spaco Manufacturing's obligations under the stock purchase agreement. The remaining $428,890.42 *62 was used to pay the principal amount due on an existing note of Brown Corporation in the amount of $400,000, interest on that note of $9,292.25, and to provide Brown Corporation with working capital of $19,598.17. On December 18, 1973, Spaco Manufacturing, Brown Corporation, and Mr. Lampe executed various documents in connection with the loan from MorAmerica. The loan transaction was structured with Brown Corporation as the borrower. Brown Corporation gave its two mortgage notes in the amounts of $322,000 and $8,000, both notes being secured by a mortgage on its real estate and by security agreements covering its equipment, inventory, and accounts receivable. Mr. Lampe, individually, and Spaco Manufacturing each guaranteed the payment on the notes. The 21,800 shares of stock in Brown Corporation were also placed in a trust with the First National Bank of Lake Forest and were pledged as security for the loan from MorAmerica. As a further part of the loan transaction, Brown Corporation issued a stock purchase warrant to MorAmerica which entitled MorAmerica to purchase within 10 years 6,294 shares of the stock of Brown Corporation at a price of $52.43 per share. MorAmerica disbursed *63 $330,000 to Brown Corporation on January 2, 1974. Of this amount, $322,000 was used to discharge Spaco Manufacturing's obligations under the purchase agreement and $8,000 was used as working capital of Brown Corporation. On December 18, 1973, Mr. Lampe, as Brown Corporation's chairman of the board, executed on its behalf a security agreement and a mortgage on its real estate securing the payment of Spaco Manufacturing's promissory note in the amount of $687,454 to Mr. Brown. The unpaid principal balance of this note on August 31, 1974, was $647,454. A principal payment of $10,000 had been made on January 4, 1974, and Mr. Lampe had also paid $30,000 from his own funds. On December 18, 1973, Mr. Lampe, as Brown Corporation's chairman of the board, executed and delivered a further promissory note of petitioner's to Associates in the amount of $327,546 along with a security agreement pledging Brown Corporation's furniture, fixtures, machinery and equipment to secure payment of that note. On the same date, Associates issued to Brown Corporation its letter of credit in the amount of $327,546. Mr. Lampe, acting as brown Corporation's chairman of the board, on that same date in turn *64 assigned the letter of credit to Mr. Coe. This assignment was in satisfaction of Spaco Manufacturing's obligation under the purchase agreement and under a promissory note executed by Spaco Manufacturing on December 18, 1973, to pay Mr. Coe $327,546 on January 2, 1975. Spaco Manufacturing on December 18, 1973, also issued a promissory note to Mr. Coe and two promissory notes to Mr. Brown. The note issued to Mr. Coe was in the amount of $50,000 and represented the unsecured note which he had agreed to take in order to help the purchase transaction proceed to closing. One of the notes issued to Mr. Brown was in the amount of $687,454. This was the note which, under the security agreement, was secured by a mortgage of Brown Corporation's real estate. The second promissory note issued on December 18, 1973, from Spaco Manufacturing to Mr. Brown was in the amount of $41,629.75 and represented the interest payment owed Mr. Brown at closing which he had agreed to loan back to Spaco Manufacturing. From time to time during 1974, Brown Corporation advanced money to Spaco Manufacturing for various purposes including payment of the principal and interest on the promissory note for $50,000 *65 which had been issued by Spaco Manufacturing to Mr. Coe on December 18, 1973, and interest on the $687,454 promissory note which had been given by Spaco Manufacturing to Mr. Brown on December 18, 1973. These amounts which Brown Corporation disbursed were entered on its books of account as amounts due it from Spaco Manufacturing. These advances included the following: Five principal payments to Orson E. Coe on
the $50,000 promissory note from Spaco
Manufacturing
$ 35,000.00
Three interest payments to Orson E. Coe on
the $637,454 promissory note given by
Spaco Manufacturing
19,652.76
Three interest payments to Edward H. Brown
on the $687,454 promissory note from Spaco
Manufacturing
38,188.94
A payment to Spaco, Inc., to help meet its
payroll
15,000.00
A payment on April 11, 1974, of $31,729.75
to Spaco Manufacturing and a concellation of
a debt due Brown Corporation from Edward H.
Brown of $9,900, both for the purpose of
paying the $41,629.75 promissory note from
Spaco Manufacturing to Edward H. Brown
41,629.75
Seven miscellaneous items
18,870.51
$168,341.96 The following reductions are necessary in order to correctly show the balance listed on Brown Corporation's books as receivable from Spaco Manufacturing: *66 Brown Corporation received $41,629.75 on
December 18, 1973, from Edward H. Brown for
which Spaco Manufacturing issued its note
to Edward H. Brown
$ (41,629.75)
Spaco Manufacturing paid $2,521.87 of Brown
Corporation's expenses, and that amount was
credited to the Spaco Manufacturing account
(2,521.87)
Brown Corporation's auditors determined that
three of the miscellaneous items were expenses
of Brown Corporation instead of Space Manufacturing
and those items were credited on Brown
Corporation's books to the Spaco Manufacturing
account
(3,231.07)
The balance shown on Brown Corporation's books as receivable from Spaco Manufacturing was $120,959.27. At a meeting of the shareholders of Brown Corporation on March 8, 1974, Spaco Manufacturing, acting through Mr. Lampe, elected several other individuals to be directors of Brown Corporation. These other individuals were business acquaintances of Mr. Lampe.On June 19, 1974, at a meeting of the directors of Brown Corporation, one of the new directors, acting on behalf of Mr. Lampe, requested the resignations of Mr. Brown as the president of the corporation, of Mr. O'Connor as the secretary of the corporation, and of the individual who held the post of treasurer *67 of the corporation. At that same meeting, a completely new slate of officers of Brown Corporation was appointed. Almost all of these new officers were business acquaintances of Mr. Lampe. Mr. O'Connor, however, continued in a position with Brown Corporation as its assistant secretary.Shortly after that meeting, the newly appointed president of Brown Corporation, one of the business acquaintances of Mr. Lampe who had also been named as a director of the corporation, brought to Ionia another individual who, for all practical purposes, made all the management decisions concerning the day-to-day operations of Brown Corporation. On September 12, 1974, at a special meeting of Brown Corporation's shareholders at Ionia, Michigan, Mr. Lampe, acting as president of Spaco Manufacturing, amended petitioner's by-laws to provide for one director of Brown Corporation. At that meeting all other directors except Mr. Lampe were removed. The following officers were named by the director: John B. Lampe
President
Edward H. Brown
Executive Vice President
R. L. Court
Treasurer
Rex P. O'Connor
Secretary
Allison Smith
Assistant Treasurer
C. T. Brown
Assistant Secretary
On Cotober 11, 1974, a meeting of the sole *68 director of petitioner was held in Ionia, Michigan. In attendance at that meeting were Mr. Lampe, Edward H. Brown, R.L. Court, Rex P. O'Connor and representatives of MorAmerica and Associates. At that meeting it was reported that as of the end of fiscal year ended August 31, 1974, the pre-tax profits of petitioner were approximately $200,000, the receivables were approximately $1,146,000, and the payables were approximately $854,000. The amount owed to Associates was approximately $1,999,000, and approximately $330,000 was owed to MorAmerica. [2]
On November 8, 1974, Mr. Lampe was arrested by FBI agents in Huntsville, Alabama, on charges of interstate transportation of forged securities valued at over $3,500,000. Upon subsequent investigation, it was determined that the assets held in the trust at the First National Bank of Lake Forest, Illinois, the beneficial interest of which was owned by Mr. Lampe, consisted entirely of counterfeit stock certificates. On November 19, *69 1974, Mr. Brown and Mr. O'Connor met with Mr. Lampe in the Huntsville, Alabama, jail. Mr. Lampe executed and delivered to Mr. Brown a stock assignment by which he assigned the 21,800 shares of Brown Corporation stock that had been pledged to MorAmerica to Mr. Brown. Under the assignment, Spaco Manufacturing, through Mr. Lampe as its president, transferred the shares to Mr. Brown. The assignment provided as follows: For Value Received Spaco Manufacturing Company hereby sell, assign and transfer unto Edward H. BrownTwenty One Thousand Eight Hundred (21,800) Shares of the Common Capital Stock of the Brown Corporation of Ionia, Inc. standing in Spaco Manufacturing Company name on the books of said corporation represented by Certificate No. Thirty Three (33) herewith and do hereby irrevocably constitute and appoint Rex P. O'Connor attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises, said assignment being subject to all existing or prior assignments, as well as claims of any creditors of John B. Lampe or Spaco Manufacturing Company. The words in the text of the assignment, "said assignment being subject to all *70 existing or prior assignments, as well as claims of any creditors of John B. Lampe or Spaco Manufacturing Company" were handwritten in by Mr. Lampe. On that same date, Mr. Lampe as the sole director of Spaco Manufacturing adopted a resolution providing for the assignment of the shares. Subsequently, Mr. Lampe was indicted on two counts for violations of 18 U.S.C. sec. 1014 for willfully over valuing certain securities for the purpose of influencing the action of a federally insured bank to make loans, and for six counts for violations of 18 U.S.C. sec. 2314 for knowingly transporting in interstate commerce certain securities and moneys, knowing said securities and moneys to have been taken by fraud. Mr. Lampe pleaded guilty in the United States District Court for the Northern District of Illinois to all counts contained in the indictment. A meeting of shareholders of Brown Corporation was held on November 21, 1974, in Ionia, Michigan. Present at that meeting were Mr. Edward H. Brown; Mr. Rex P. O'Connor; Mr. Thomas Turner, representing Associates; Messrs. Paul Rhines, Jerry Burroughs and Joseph Braunger, representing MorAmerica; Mr. R. L. Court and Mr. Charles T. Brown. Mr. O'Connor *71 stated that, in his opinion as an attorney, Mr. Brown was the owner of 21,800 shares of Brown Corporation's stock and was qualified to vote the stock at that meeting. At that meeting, it was determined that Mr. Brown, Mr. Charles T. Brown and Mr. O'Connor would be the directors of Brown Corporation until the next annual meeting of the stockholders or until successors were elected and qualified. As of November 21, 1974, Brown Corporation had made no repayment of the $330,000 owing to MorAmerica or of the $327,456 owing to Associates. By November 1, 1974, Brown Corporation had borrowed a total of $8,910,000 from Associates on its $1.6 million line of credit and had repaid $7,769,943.32, leaving a balance due of $1,140,056.68. The largest monthend balance was at April 30, 1974, in the amount of $1,317,305.82 and the smallest monthend balance was at June 30, 1974, in the amount of $658,370.13 All of the former shareholders of Brown Corporation, except Mr. Brown and Mr. Coe, received all of the payments called for under the stock purchase agreement of September 27, 1973. Mr. Coe did not receive full payment of the $50,000 unsecured note he had taken from Spaco Manufacturing, although *72 he subsequently received $35,000 in payments on the note from Brown Corporation. Mr. Brown did not receive full payment on the $677,454 note of Spaco Manufacturing, and as of the date of the trial in this case he had only been paid approximately one-third of the principal amount owed on this note. Brown Corporation on its income tax return for its taxable year ended August 31, 1974, claimed a bad debt deduction in the amount of $2,144,068.85. This $2,144,068.85 consisted of the following items: $687,454.00
for the note of Spaco Manufacturing given to Mr.
Brown in order to obtain his shares under the
stock purchase agreement
711,109.58
obtained in the loan transaction with Associates
which was used to satisfy Spaco Manufacturing's
obligations under the stock purchase agreement
293,662.57
obtained in the loan transaction with MorAmerica
which was used to satisfy Spaco Manufacturing's
obligations
327,546.00
obtained from Associates in return for Brown
Corporation's note, which was used to satisfy
Spaco Manufacturing's obligations to Mr. Coe
under the stock purchase agreement
149,296.70
for advances made to Spaco Manufacturing which
had not been repaid
15,000.00
for the balance owed on the $50,000 note of Spaco
Manufacturing given to Mr. Coe [3] *73 The return on the Schedule L--Balance Sheets disclosed that Brown Corporation's liabilities at the beginning and at the end of the taxable year 1974 included the following: Beginning of
End of
Taxable Year
Taxable Year
Mortgages, notes, bonds payable
in less than 1 year
$176,155.36
$1,466,579.60
Mortgages, notes, bonds payable
in 1 year or more
202,116.08
1,079,170.82
The Schedule L--Balance Sheets included in Brown Corporation's income tax return for its taxable year ended August 31, 1975, disclosed that its liabilities at the beginning of that taxable year and at the end of that taxable year included the following: Beginning of
End of
Taxable Year
Taxable Year
Mortgages, notes, bonds payable
in less than 1 year
$1,466,579.60
$391,699.11
Mortgages, notes, bonds payable
in 1 year or more
1,079,170.82
1,302,991.82
The Schedule L--Balance Sheets included in Brown Corporation's income tax return for its taxable year ended August 31, 1976, disclosed that its liabilities at the beginning of that taxable year and at the end of that taxable year included the following: Beginning of
End of
Taxable Year
Taxable Year
Mortgages, notes, bonds payable
in less than 1 year
$391,699.11
$157,845.40
Mortgages, notes, bonds payable
in 1 year or more
1,302.991.82
1,130,933.71
Respondent *74 in his notice of deficiency gave the following explanation: The bad debt deduction you claimed in the amount $2,144,068.85, allegedly funds expended on behalf of Spaco Manufacturing Company, is not allowable under section 166 of the Internal Revenue Code because it has not been established that a debtor-creditor relationship was intended, nor consumated for the tax year ended August 31, 1974. It is determined that you did not sustain a net operating loss in the taxable year August 31, 1974. Consequently, there is no net operating loss carryback to prior years and no net operating loss deductions are allowable in the taxable years August 31, 1971, August 31, 1972 and August 31, 1973. Form 1139, Application for Tentative Carryback Adjustments, filed by you December 30, 1974, resulted in erroneous tentative allowances of $76,042.00, $64,533.23 and $227,522.16 for the years August 31, 1971, August 31, 1972 and August 31, 1973 respectively. Petitioner in its petition alleged the following: (1) that it was entitled to a bad debt deduction in its taxable year 1974 in the amount of $2,144,068.85 and, therefore, sustained a net operating loss in such taxable year which could be carried *75 back to its 1971, 1972, and 1973 taxable years; (2) alternatively, that it sustained a theft loss in the amount of $2,144,068.85 in its taxable year 1974; and (3) further in the alternative, that it was entitled to either a bad debt deduction or a theft loss deduction, or both, in the aggregate amount of $2,144,068.85 in one or more of its taxable years 1975, 1976, or 1977, and that any net operating loss sustained in such year or years would entitle petitioner to a net operating loss carryback from such year or years to prior years. Petitioner, in an amendment to its petition, alleged the following: Brown [Corporation] was injured in its business and property because of Lampe's violation of 18 U.S.C. 1962 and was entitled to recover threefold the damages it sustained under 18 U.S.C. 1964(c). Its damages included the $2,144,068.85 that it used to pay debts of Lampe and Spaco [Manufacturing] and additional damages arising from increased interest expense on borrowings, and the loss of business as a result of damage to its reputation and standing in the business community caused by Lampe's arrest and adverse publicity. Brown [Corporation] was entitled to at least $6,450,000 from Lampe *76 and Spaco [Manufacturing], which was an amount that became wholly worthless in the taxable year ended August 31, 1974. Petitioner alleged in its amended petition (1) that it was entitled to either a bad debt deduction or a theft loss deduction, or both, in the aggregate amount of no less then $6,450,000 in one or more of its taxable years 1974, 1975, 1976, or 1977; (2) that it sustained a net operating loss in such year or years; and (3) that it is entitled to a net operating loss carryback from such year or years to prior years. The parties have stipulated that if the $687,454, $711,109.58, $293,662.57, $327,546 and $120,959.27 amounts upon which petitioner bases its claim for a bad debt deduction are found to be valid debts of Spaco Manufacturing or Mr. Lampe, or both, to Brown Corporation, Spaco Manufacturing and Mr. Lampe became insolvent and unable to pay any of such debts during Brown Corporation's 1974 taxable year. OPINION We have set forth in considerable detail in our findings the negotiations leading up to the sale of all of the shares of stock of Brown Corporation to Spaco Manufacturing, the various financing transactions entered into to provide Spaco Manufacturing with *77 sufficient funds to pay for the stock and the actual operation of petitioner by Spaco Manufacturing. Unquestionably, as a result of these happenings petitioner's financial position took a turn for the worse. The record shows that prior to these events Brown Corporation was a successful, ongoing business with little, if any, debt. Petitioner contends that it is entitled to either a bad debt deduction or a theft loss deduction in one or more of its taxable years 1974, 1975, 1976 or 1977.Respondent, on the other hand, denies that petitioner is entitled to either a bad debt deduction or a theft loss deduction and, further, asserts that most of the payments actually made by petitioner simply represented a dividend distribution by it to its sole shareholder, Spaco Manufacturing. It is well settled that if a corporation pays off a debt of a shareholder, such payment constitutes a distribution to the shareholder under section 301. Wall v. United States,164 F.2d 462 (4th Cir. 1947); Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980). A distribution under section 301 may be considered as constructively made even though the corporation has not formally declared a dividend. Crosby v. United States,496 F.2d 1384, 1388-1389 (5th Cir. 1974); *78 Yelencsics v. Commissioner,supra.The record is clear that Spaco Manufacturing was under a binding contractual obligation to purchase the shares of Brown Corporation from the Brown Corporation shareholders and subsequently Brown Corporation joined directly or indirectly in financing transactions whereby funds were provided to discharge this obligation of Spaco Manufacturing. Any use of Brown Corporation's funds to discharge Spaco Manufacturing's obligations under the stock purchase agreement would be a dividend to Spaco Manufacturing unless it and Brown Corporation had intended that the money which Brown Corporation had raised through loans from third parties would be repaid to Brown Corporation by Spaco Manufacturing. United States v. Smith,418 F.2d 589, 593 (5th Cir. 1969). Obviously, as will be discussed infra, if in fact what occurred was a section 301 distribution by petitioner to Spaco Manufacturing, no debt would have arisen, nor would any theft have occurred. In any event, both the cases deciding whether the shareholder had a dividend and the cases deciding whether his corporation subsequently became entitled to a bad debt deduction have focused on the same common issue. *79 The resolution of such issue involves the factual determination of whether the parties, the corporation and the shareholder, contemporaneously with the discharge of the personal obligation of the shareholder intended to establish an enforceable obligation of repayment. Delta Plastics Corp. v. Commissioner,54 T.C. 1287, 1291-1292 (1970); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). Petitioner here bears the burden of proof in showing the existence of bona fide debts. Rule 142(a), Tax Court Rules of Practice and Procedure. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed and determinable sum. Section 1.166-1(c), Income Tax Regs.
Petitioner argues that the representations made by Mr. Lampe, that he would at some later date put sufficient money into Spaco Manufacturing to enable it to pay off the different loans being taken out, shows that Brown Corporation did intend that the money be repaid to it and that it be made whole for any sums it paid to third parties. At the closing of the stock purchase transaction, when Spaco Manufacturing acquired all the Brown *80 Corporation shares, it, Mr. Lampe and petitioner also entered into various financing arrangements. Petitioner's property on that same date was pledged as security for the note of Spaco Manufacturing given to Mr. Brown. Simultaneously, three other loan transactions were entered into with the two commercial lending institutions, Associates and MorAmerica. Two loans, one from MorAmerica in the amount of $330,000, and one from Associates in the amount of $327,546, were taken out by Brown Corporation as sole borrower. Another loan of $1,065,000, from Associates, was taken out by Spaco Manufacturing and Brown Corporation as co-borrowers. Additionally, subsequent to closing various additional sums totaling $120,959.27 were disbursed by petitioner to pay obligations of Spaco Manufacturing and listed on petitioner's books as being owed to it. The argument of petitioner overlooks the fact that Brown Corporation on the crucial date had been taken over by Spaco Manufacturing since it became the sole owner of all the outstanding shares of the corporation. Certainly prior to that date, Mr. Brown, Mr. Coe, the other former Brown Corporation shareholders, and Mr. O'Connor, [4] *82 as well as the other *81 officers of Brown Corporation, believed the representations made by Mr. Lampe. Mr. Lampe was successful in conning not only the shareholders of Brown Corporation but also the lending institutions which furnished most of the money by which the transaction was consummated. However, at the time when Spaco Manufacturing became sole shareholder, Brown Corporation was so dominated by Spaco Manufacturing, acting through Mr. Lampe, that it is clear that no intent on Brown Corporation's part existed that money obtained which was being used to discharge Spaco Manufacturing's obligation under the stock purchase agreement would be repaid. Mr. Lampe was the guiding force and controlling personality of the corporation. Therefore, the intent of the corporation would be dependent on Mr. Lampe's intent. Moreover, before a valid debt could exist there would also have to have been an intention by Spaco Manufacturing or Mr. Lampe to repay the funds. The inference is clear that such an intention did not exist. All of the stock certificates in the trust at the Illinois bank were counterfeit. Mr. Lampe simply had nowhere near the resources to make good on the funds borrowed. The fact that the advances of $120,959.27 by petitioner to Spaco Manufacturing were listed on Brown Corporation's books as being owed to it is not controlling. In order to find that a debt existed, the parties must have intended to debt to arise. Mere bookkeeping entries will not suffice when such intention is lacking. Delta Plastics Corp. v. Commissioner,supra at 1292. Accordingly, we find that Mr. Lampe's oral representations in the *83 negotiations culminating in Spaco Manufacturing's acquisition of all the Brown Corporation shares did not give rise to a debt owing to petitioner from either Spaco Manufacturing of Mr. Lampe. Petitioner makes the further claim that a debt subsequently arose by operation of law. In making this argument, petitioner chiefly relies upon the doctrine of subrogation. Petitioner in effect argues that its position here can be viewed loosely as that of a guarantor. Petitioner claims that since it is a surety or guarantor, when Spaco Manufacturing and Mr. Lampe were unable to pay the loans and defaulted on them, Brown Corporation became the debtor of Spaco Manufacturing and Mr. Lampe. Subrogation is a legal fiction-- through which a person who, not as a volunteer or in his own wrong, and in absence of outstanding and superior equities, pays debts of another, is substituted to all rights and remedies of that other, and the debt is treated in equity as existing for his benefit, and such doctrine is broad enough to include every instance in which one party pays the debt for which another is primarily answerable. Foremost Life Insurance Co. v. Waters,88 Mich. App. 599, 278 N.W.2d 688, 689 (1979). *84 In the present case there are five separate individual financing transactions which petitioner claims, through subrogation, led to a debt arising between petitioner and Spaco Manufacturing or Mr. Lampe.These are as follows: (1) $646,454 for the note of Spaco Manufacturing given to Mr. Brown, payment of which had been secured by mortgages on petitioner's asserts and on which Mr. Brown is still owed approximately two-thirds; (2) $711,109.58 for amounts obtained in the loan transaction with Associates under which Spaco Manufacturing and Brown Corporation were primary borrowers; (3) $322,000 of funds obtained in the loan transaction with MorAmerica under which Brown Corporation was the sole borrower; (4) $327,546 for amounts obtained in a second transaction with Associates under which Brown Corporation was the sole borrower; and (5) $120,959.27 for advances made to Spaco Manufacturing by Brown Corporation. We do not entirely understand petitioner's asserted claim of subrogation. From what we gather, petitioner's argument is as follows: Since Spaco Manufacturing was liable to various third parties, and since petitioner is required to make good on such liability, a debt is owing by Spaco *85 Manufacturing to it. We have already found that the $120,959.27 in advances made to Spaco Manufacturing was not a loan to it by Brown Corporation. Since there was no direct debt owing from Spaco Manufacturing, obviously no debt could have arisen indirectly under a theory of subrogation. Brown Corporation was the borrower of the $322,000 obtained in the loan transaction with MorAmerica and the $327,546 obtained from Associates. Subrogation arises only in favor of him who pays the debt of another, and not in favor of one who pays the debt in performance of his own separate and distinct covenant. Michigan Hospital Service v. Sharpe,339 Mich. 357, 63 N.W.2d 638, 641 (1954); Machined Parts Corp. v. Schneider,289 Mich 567, 286 N.W. 831, 834 (1939). See also, Dreyfuss v. Commissioner,140 F.2d 922 (5th Cir. 1944), affg. a Memorandum Opinion of this Court; Estate of Schwehm v. Commissioner,17 T.C. 1435 (1952). [5]
Additionally, subrogation usually does not arise until the guarantor or surety makes full payment of the debt of the other party. Associated Truck Lines v. Employers' Fire Ins. Co. of Boston, Mass.,275 Mich. 74, 265 N.W. 780 (1936). *86 See also, American Surety Co. v. Electric Co.,296 U.S. 133, 137 (1935); Rietzke v. Commissioner,40 T.C. 443, 451 (1963). All of the amounts owing to third parties had not been paid by petitioner as of the close of the 1974 fiscal year. It is clear that the amount owed by Spaco Manufacturing to Mr. Brown had not been fully paid at the time of the trial of this case. It is unclear from the record whether Associates had been paid the full $711,109.58 of the amount owed to it in the loan transaction under which Spaco Manufacturing and Brown Corporation were co-borrowers at the time of the trial of this case. The record does show that this amount had not been fully paid by the end of petitioner's fiscal year 1977. It is unclear from the record whether the $327,546 obtained in the second loan transaction with Associates and the $322,000 obtained in the loan transaction with MorAmerica had been completely repaid at the time of the trial of this case. However, as discussed previously, since Brown Corporation was the sole borrower on both these loans, no right of subrogation could accrue to it. Lastly, we would observe that subrogation is an equitable doctrine. Foremost Life Ins. Co. v. Waters,supra. *87 We agree with respondent that many of the amounts underlying petitioner's claim are properly characterized as dividends to Spaco Manufacturing, Brown Corporation's sole shareholder. The funds obtained in the two loan transactions in which petitioner was sole borrower were its funds. The use of these funds to discharge Spaco Manufacturing's obligations under the stock purchase agreement with the former Brown Corporation shareholders was a dividend to Spaco Manufacturing. Apschnikat v. United States,421 F.2d 910, 913 (6th Cir. 1970); Wall v. United States,supra.The use of $120,959.27 of petitioner's funds to pay Spaco Manufacturing's obligations, although listed on petitioner's books as an advance to its shareholder, was in fact also a dividend. Delta Plastics Corp. v. Commissioner,supra;Haber v. Commissioner,supra.Any payments by petitioner in discharge of the obligation on which petitioner was a co-borrower which benefited Spaco Manufacturing while it was the shareholder of petitioner would be a distribution to Spaco Manufacturing under section 301(a). It is immaterial that on the loan to Associates petitioner was a co-borrower. While petitioner at the time of payment was *88 discharging its own liability to Associates, there was no valid business purpose for it initially assuming such liability. Yelencsics v. Commissioner,supra at 1529-1532. Since many of the payments made by Brown Corporation of Spaco Manufacturing's liabilities under the stock purchase agreement constituted dividends to Spaco Manufacturing, we conclude that petitioner could not have been subrogated to any debt. Brown Corporation participated in the loan transactions by which money was raised to pay off Spaco Manufacturing's obligations to the former Brown Corporation shareholders. As an equitable remedy, subrogation is subject to all the normal rules of equity and, accordingly, it has been held that the doctrine cannot be applied in favor of a party who voluntarily surrenders the right or who has participated and assisted in the wrong. [6] *89 See Drettmann v. Marchand,337 Mich. 1, 59 N.W. 2d 56 (1953). Since petitioner may not avail itself of the doctrine of subrogation, no debt owing from Spaco Manufacturing or Mr. Lampe to it could have risen by way of such doctrine. Petitioner's last argument, that it is entitled to a bad debt deduction, is based on a contention that Mr. Lampe engaged in racketeering activities in violation of 18 U.S.C. sec. 1962, and petitioner was therefore entitled to bring a civil suit to recover three-fold the damages suffered under 18 U.S.C. sec. 1964(c). Petitioner overlooks the fact that this claim has not been reduced to judgment, and represents nothing more than a potential cause of action. Such an unadjudicated claim cannot constitute a debt. Proesel v. Commissioner,77 T.C. 992, 1002 (1981); Hanes v. Commissioner,2 T.C. 213 (1943). It is only when judgment is entered that a debtor-creditor relationship is created by operation of law. At such time, the party in favor of whom judgment was entered becomes a judgment-creditor. [7] Since petitioner has not proven that a debt existed between it and Spaco Manufacturing or Mr. Lampe, we find *90 that petitioner is not entitled to a bad debt deduction in either its fiscal year 1974 or in any of its fiscal years 1975, 1976 and 1977. Petitioner's alternative contention is that it is entitled to a theft loss deduction under section 165(a). Whether a loss from theft has occurred for section 165 purposes is largely dependent on the provisions of State criminal law. Edwards v. Bromberg,232 F.2d 107, 110-111 (5th Cir. 1956).However, a Federal criminal statute provides the requisite criminality so that a taking of a taxpayer's property may appropriately be considered a theft under section 165. E. G. Nichols v. Commissioner,43 T.C. 842, 885 (1965) (held mail fraud, in violation of 18 U.S.C. sec. 1341 is a theft under section 165). For a theft or other similar offense to have occurred under Michigan law, there must have been a criminal and wrongful taking of property. In People v. Manning,38 Mich. App. 662, 197 N.W.2d 152 (1972), the court stated that to constitute the offense of larceny, the taking *91 must be without the consent and against the will of the owner. We conclude from the evidence that Brown Corporation consented to the use by Spaco Manufacturing of its funds. Spaco Manufacturing was the sole shareholder of Brown Corporation and acting through Mr. Lampe, the chairman of its board, arranged the transactions here involved. Therefore, there was no taking of petitioner's property without its consent and against its will. We find that no theft under State law occurred. The funds obtained through petitioner's participation in various loan transactions were clearly used with the implied consent of petitioner in discharging the obligations of Spaco Manufacturing under the stock purchase agreement. Drybrough v. Commissioner,238 F.2d 735 (6th Cir. 1956), affg. 23 T.C. 1105 (1955); Federbush v. Commissioner,34 T.C. 740, 749-751 (1960), affd. 325 F.2d 1 (2d Cir. 1963). Under the same reasoning, we also find no taking of petitioner's property under Federal criminal law. Petitioner is therefore not entitled to a theft loss deduction in any of the years in issue. Because of certain adjustments in the notice of deficiency not placed in issue in the pleadings, Decision will *92 be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
a. Does not include interest of 8 percent per annum earned from 6/1/73 to this date, which is also payable at closing. ↩
b. Balance of purchase amounts owed to each of various individual shareholders to be evidenced by promissory notes of Spaco Manufacturing which it is to deliver to them at closing.↩
a. Does not include interest earned on this $10,000 purchase amount payment since closing, which is also payable at this date. ↩
b. Does not include interest earned on balance of purchase amount owed since closing, which is also payable at this date. Thereafter, any further interest earned in the purchase amounts owed to Mr. Coe is payable quarterly through 1/2/75.
c. Does not include interest earned on balance of purchase amount since closing, which is also payable in full at this date.↩
a. First of 10 equal installments payable over 10-year period commencing on this date and continuing on September 1 of each year after. Interest earned on this $677,454 balance of purchase amount to be paid in 10 installments is payable on first day of March, June, September, and December beginning 3/1/74.↩
2. The parties have stipulated that the officers of Brown Corporation, other than Mr. Lampe, were unaware at the date of the meeting on October 11, 1974, of the facts which petitioner alleges constitutes a theft.↩
3. Petitioner conceded on brief that it is not entitled to a deduction for this amount.
4. Mr. O'Connor's role in the stock purchase transaction was that of attorney for the individual shareholders. Mr. O'Connor admitted to such in his testimony. Thus, we refuse to accept petitioner's contention that there was a valid corporate business purpose for Brown Corporation's joining in the various financing transactions. Brown Corporation's assumption of liabilities was undertaken for the primary, if not the sole, purpose of benefiting Spaco Manufacturing. At any rate, even if the beliefs of Mr. O'Connor and the selling shareholders could be imputed to Brown Corporation, such belief would not be controlling. The simple fact of the matter is when Mr. Lampe, through Spaco Manufacturing, acquired control of Brown Corporation, that corporation became his alter ego.
5. See also, Shrout v. Commissioner,T.C. Memo. 1973-89↩.
6. Obviously, the former Brown Corporation shareholders were defrauded by Mr. Lampe, although of them only Mr. Brown suffered any detriment. The others, for the most part, were paid off in full. The two commercial lending companies were also defrauded. However, as will be discussed more fully infra,↩ since Brown Corporation was in effect Mr. Lampe's corporation, no fraud was consummated on it.
7. Even at such time no bad debt deduction is allowed unless the income such item represents has been included in the return of income for the year in question or a previous year.↩